**UNITED STATES v. CERTAIN PREMISES KNOWN AS NO. 432–434 EAST 49TH STREET, BOROUGH OF MANHATTAN, CITY AND STATE OF NEW YORK et al.**

United States District Court
S. D. New York.

Aug. 19, 1949.

Harry T. Dolan, Special Assistant to the Attorney General of the United States, attorney for petitioner-plaintiff.

Judd & Gurfein, New York City, attorneys for claimants (Orrin G. Judd, New York City, of counsel).

KENNEDY, District Judge.

On August 2, 1946, the government filed its petition, seeking to acquire the exclusive use, occupancy and possession of two parcels of property containing approximately 17,700 square feet of land. The property is on the southerly side of East 49th Street adjacent to what is now known as Roosevelt Drive. On February 11, 1947, the government amended its petition to take the use of an additional area of approximately 660 square feet in the same tract. This made a total of 18,360 square feet. But later the City of New York, by condemnation, took 3,382.1 square feet of the same property in order to widen Roosevelt Drive. There was, therefore, left in the possession of the government less than 15,000 square

feet. Possession was taken by the government of the first of the portions condemned on September 5, 1946, and of the second portion on February 11, 1947.

It now becomes necessary to describe a larger area of which the subject premises form a part.[1]

The land taken for use by the government is designated on the New York tax map as block 1360, lot 26, and (in part) lots 34 and 35. The original petition related to lot 26, the middle portion of lot 34, and the northerly portion of lot 35; the amended petition added the northerly portion of lot 34. The whole tract of which the subject premises were part was in the spring of 1946 in three ownerships. Lots 14, 15, 16, 34, 35 and 37 were owned by Arco Estates, Inc.; I shall call these collectively the Arco property. Lot 26 was owned, when taken, by Beekman Estate, and later (December 26, 1946), by Rose and Henry Friedenberg; lot 38 was owned by one David S. Herzog. These lots I shall refer to by their numbers. All of the land, the use of which was taken by the government, was a portion of certain lots under lease to one David Connett. The Arco property had been subjected on November 18, 1941, to a lease for ten years (this included lots 34 and 35); as for lot 26 that was leased to Connett on March 18, 1946, for a term of one year from April 1, 1946. At the time of the taking, so far as lot 26 is concerned, Connett, having held over, was a "statutory tenant". His tenancy could from 1946 on have been terminated (McKinney's Unconsolidated Laws, Section 8528, sub. (c) and (b)) if the landlord either desired possession for his own use or if he was about to demolish existing buildings and to construct new buildings. The ten-year lease affecting lots 34 and 35 (part of the Arco property) contained a cancellation clause under which the landlord could gain possession within 60 days after notice to Connett or his successor in estate.

At the time of the taking, there were on lot 26 ten concrete coal pockets and a two-story brick building known as 432 East 49th Street. On lot 34 (part of the Arco property) there was a three-story brick building known as 428 East 49th Street; on a portion of lot 35, in the same ownership, there was a timber coal pocket. As for the remainder of the Arco tract (not taken) lot 16 was entirely vacant.[2] Lot 15 was improved by a one-story building, lot 14 by a two-story building, and lot 37 also by a two-story building; lot 38 was improved by a two-story garage.

It now becomes timely to explain why I have placed considerable stress on the fact that the subject premises were, at the time of the taking, part of what I have called a "larger area". Beginning on July 1, 1946, the Webb and Knapp syndicate, through dummies, one of whom was the claimant Mann, set out to assemble a tract of land between East 48th and East 49th Streets and fronting on what has since become Roosevelt Drive. It is necessary to touch briefly on the chain of title. In doing so I shall disregard, so far as possible, irrelevant complications and devices, and shall speak as if the ultimate beneficial-claimants had acted directly.[3]

On July 1, 1946, a contract was made for the purchase of the Arco property. This was consummated by a deed on September 16, 1946. On July 9, 1946, a contract was made for the purchase of lot 26, but no deed passed until June 30, 1947. On December 16, 1946, a contract was made for the acquisition of lot 38; the deed was delivered on February 14, 1947. As I have indicated, no part of lot 38 was taken by the government, but the ownership and

---

1. Claimant's exhibit A shows very clearly what I am about to describe; claimant's exhibits B, C and D are air views of this larger area including the subject premises.

2. The air views show it as a car park.

3. As a matter of fact, as I have said, in the beginning the assembly was by the "Webb and Knapp syndicate" in which the present owner-claimants were participants. After the assembly had been completed, they purchased the outstanding interest in the property here involved from the other participants, taking title in the name of claimant Levy, a dummy. But throughout I shall call her the claimant.

right to possession of that lot is nevertheless a relevant circumstance. It is to be kept in mind that the government entered into possession of the major portion of the Arco property taken (September 5, 1946), after the making of contract for this property (July 1, 1946) but prior to the delivery of the. deed (September 16, 1946). The same situation exists with respect to lot 26: the contract was made on July 9, 1946, the government took possession on September 5, 1946, and the deed was not delivered until June 30, 1947.

An interlocutory judgment of condemnation was entered on March 25, 1947. The only claimants who appeared at the trial (May 20, 1947) and made any claim to compensation were David Connett, and a sub-tenant of his (Eastern Transport Inc.). At that time the beneficial fee ownership was, apparently, in the Webb and Knapp syndicate. Claimant Levy then had no interest or standing, even superficial, for it was not until March 26, 1948, that the transaction occurred by which the property passed from Webb and Knapp to Bertha Levy and those whom she represents. On December 3, 1948, Connett withdrew $10,046.48, the amount on deposit for the use of the premises from September 5, 1946, to November 30, 1948. It is now necessary to say that while the original petition filed by the government (August 2, 1946) contemplated use and occupancy for a term of years ending June 30, 1947, the government, in accordance with a reserved right, elected to extend this term to June 30, 1948. There was a second extension filed on May 24, 1948, enlarging the term over the year ending June 30, 1949, but on November 30, 1948 the government surrendered possession.

As I have said, the only claimants who appeared at the trial (May 20, 1947) were Connett and Eastern Transport Inc. After the trial, but before decision, Judge Bright, who had presided, died. The proceeding was then noticed for retrial. Connett by that time was satisfied to take the money on deposit in the registry of the court. But when he made his application to withdraw that sum (December 1948), for the first time the claimant Levy appeared.

While she did not oppose the withdrawal by Connett, she requested a reservation of jurisdiction by the court to fix consequential damages, to which she claimed to be entitled. The order granting Connett's motion for payment contained a reservation on this point, as did a final order and judgment made on January 11, 1949, fixing Connett's compensation for the use and occupancy taken.

At the trial of the reserved issue the position taken by the claimant Levy, as nearly as I can summarize it, was as follows: she said that over various dates prior to the taking by the government, her predecessors were contract vendees of the subject premises and of contiguous property (July 1, 1946—the Arco property; July 9, 1946—lot 26). She says further that after the taking (September 5, 1946) her predecessors in interest became contract vendees of an additional contiguous tract (December 16, 1946—lot 38). Thus, she argues, the government was occupying a key portion of the property which was in course of assembly. The lease to Connett (and inferentially the existing improvements) she urges, provided no adequate return, certainly after the middle of 1946.

It is advisable at this point to digress for a moment and enlarge upon what has just been said concerning the return from the property. Prior to 1946 the land from 42nd Street to 48th Street fronting on the East River, including the Levy tract, was in effect blighted. It was occupied by slaughter houses and nondescript improvements, some of which are clearly shown in the air views in evidence in this case. Northward from 49th Street, however, was the Beekman Place residential area. And in December 1946 the United Nations project, involving the development of the East River property south of 42nd Street, became publicly known. Thus, says the claimant, the assembled tract, of which the subject premises forms part, became no longer property under a blight but rather an ideal location for either an apartment or a hotel or an apartment hotel. Underlying this trend, she says is the fact that on May 5, 1947, the block in which the subject property is situated was rezoned

and changed from an unrestricted district to a residential district.

Harking back now to the summary of claimant's argument, she says that, from 1946 on, any adequate improvement or development of her property was frustrated because of the occupancy of a substantial and valuable portion by the United States. At the trial, it was shown that in March 1947 (while beneficial ownership of the property was in Webb and Knapp) tentative plans for a hotel building on the site were drawn. But I do not believe that even claimant Levy puts great stress on this fact, for it developed at the trial that in March 1947 Webb and Knapp had no right to immediate possession of lot 38, which was included in the plan.[4] Moreover, any precise scheme of construction formulated in March 1947 would have been shortly afterward completely deranged by the fact that the City of New York launched condemnation proceedings for the taking of the East River Drive frontage of the property, and after the taking installed a ramp in front of the Levy tract, which certainly would have cut off air and light and to some extent access to the lower portion of any building erected on the site.[5]

But reasoning in this way, claimant Levy arrives at the conclusion that the occupancy of the subject premises by the United States between September 5, 1946, and November 30, 1948, inflicted consequential damage on the balance of the tract, of which she or her predecessors in title were, during that period, either the contract vendees or the owners. Her damages she assesses at $53,928.22. This is based upon the view that the asserted fee value of claimant Levy's property over the period in question is $779,000, and that given freedom of development and exclusive possession of the entire tract, a net rental of 5½% could have been realized. Offsetting the amounts actually paid by the government (and bonuses required to be paid in connection with cancellation clauses) claim-

ant's expert at the trial arrived at the figure mentioned.

So far as my own research or that of counsel is concerned, I think it is fair to say that this is a case of first impression, and one not without its difficult features. In broad outline, there is presented a situation in which the government, needing property for a parking pool for the army, discovers a suitable site in an area which is physically depressed. True it is that to the north of that site is property which has been developed into a high-class residential district. And it is also true, although presumably the government had no knowledge of the fact, that plans had been laid by Levy's predecessors to assemble a sizable tract (of which the subject premises were part). While at that time the area was part of an unrestricted zone, it is possible there were rumors of good things to come, including the United Nations project and the rezoning of the property, as well as the plans of some developers to convert the area immediately to the south into a "Dream City".

But at the time the government took possession, and each time it renewed its period of occupancy, it had displaced (so far as it knew) not developers with grandiose ideas capable of fulfillment and about to be fulfilled, but a tenant under leases, one for a term and one "statutory", who was bound to pay as rental a sum commensurate only with the former condition of the property. And even after the assembly of lots was well under way, practically down to the moment that the government relinquished possession, no attempt was made by the owners to disturb the possession of the tenant Connett by breaking his lease. At least one portion of the assemblage, vital enough to form part of the tentative hotel plan, was subject to an unbreakable lease for almost another year, during which the government was using contiguous property. The City of New York had further complicated the situation

---

4. This property, then contracted to be sold to Webb and Knapp, was also under lease, but the lease was not terminable by a cancellation clause until August 31, 1947.

5. It is probable, however, that the space fronting the ramp could be used as a garage.

during the period in question by shaving off a substantial portion of the property's frontage; and subsequently had changed the physical conditions (as it had a right to do) by the erection of a ramp. Moreover, even at the beginning of the government's possession, hostilities had ceased and the probabilities were that the need for an army parking pool would soon end.

Claimant Levy urges, however, that she was without any option except to pursue a waiting course. She points to the fact that it would have been necessary to expend several hundred thousand dollars to have prepared plans reflecting a specific scheme of development. There would have been no point, she urges, in terminating Connett's tenancy of lots 14, 15, 16, 34, 35 and 37 (the Arco tract) at substantial bonus expense, or in terminating his statutory tenancy to lot 26 by the filing of expensive building plans, so long as the government's occupancy would still have frustrated the launching of whatever scheme she hit upon.

It was acknowledged at the trial by claimant's expert that a lease could have been negotiated, even during government occupancy, to a builder, subject to that occupancy. But again the claimant Levy emphasizes that here too a large cash outlay would be necessary, because the transaction would have involved a discount of some $60,000. To put it shortly, the position of the claimant Levy is that she remained quiescent, not because the time was not yet ripe to put her property to its highest potential use but solely because the

preliminary steps to such a project would be too costly, and if the government continued in possession it might develop that she had merely frittered away these preliminary expenses. There is, however, a fact, significant to me at least, in this connection. It was not until March 26, 1948, that those whom Bertha Levy represents came into full control of such rights as they had in the property. Formerly, these persons had formed a one-third minority of the Webb and Knapp syndicate. And so far as the record shows, that syndicate, while in ownership gave no real indication that a speedy development of the tract was either prudent or possible. True enough, two months before the area was rezoned (May 5, 1947) the syndicate seems to have had a fleeting dream of a hotel. But even in putting that dream on paper, there was included a tract to which, as I have said, possession could not have been had until the following August (lot 38).[6]

As I read these facts, the claim of "consequential" or "severance" damage here advanced by the claimant Levy, ingenious as it is, boils down to the contention that the use and occupancy of a portion of her tract by the government frustrated for a time a business opportunity, and for that she should be paid, just as if she had successfully grasped that opportunity.[7] It seems to me unwise and unnecessary, for purposes of this case, to enter into any discussion, general in scope, concerning the federal rule about "consequential" damage

6. Counsel for claimant Levy urged at the trial, and persuasively, that the subjective element should not enter into any determination of her claim. In other words, they say that her own or her predecessors' intentions or ideas or plans (and when I speak of her I speak of the beneficial owners) are irrelevant on the question of the right to an award. However, when one is dealing with questions such as the feasibility and prudence of a particular scheme of property development, perhaps no evidence could be more cogent than the judgment of the owner as evidenced by his conduct, particularly if, as seems to be the case here, that owner is shrewd and experienced in the real estate field.

7. It is true that Levy formulates her claim as one under which she has been deprived of the right to use her property to its best advantage, because of the possession of the government, and perhaps that is not categorically the same as a claim for loss of a business opportunity, although fundamentally I can see little difference. But if there is a distinction, it is unimportant (at least in this case), because I have assumed in discussing the matter that Levy's claim is *not* strictly within the category of a lost business opportunity, which traditionally has never been a proper element of damage in suits to condemn property under federal law.

or perhaps more properly severance damage. For no matter what peculiar rules have been or may be formulated, still as matter of general principle underlying the whole theory of damage of any kind arising from a taking by the government is the requirement that it have the quality of certainty, so far as anything human can be certain. In United States v. General Motors Corp., 1945, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, 156 A.L.R. 390, it was certain that the claimant would be put under the expense of a temporary removal inflicted on it against its will by the government. In cases where by the taking of the property (whether in fee or for temporary use) the claimant is surely deprived of access to the remainder, there is obviously a valid claim of severance damage. It is impossible to say in the case at bar that it was probable, let alone certain, that the government's use and occupancy deprived claimant Levy of a 5½% net return on the fee value of the land, as fixed by her expert, during the period from September 5, 1946, to November 30, 1948, or any portion of that period. The development and use of the entire tract was at best in a speculative stage, and the use of a portion of the property by the government was, in my opinion, a minor factor. It certainly would in general be the height of injustice, when the government takes temporary use of a piece of land, to permit contract vendees and owners of contiguous property to sit back, bide their time, and then collect large sums, because, not probably, but *perhaps,* a business opportunity might have been lost. The claim of the defendant Levy for consequential damage is, accordingly, dismissed as too speculative to form the basis of an award.

There remains to be dealt with, briefly, another claim similar in character which has been interposed by a sub-tenant of Connett's (Eastern Transport Inc.). This claimant urges that in February 1946 it made an oral agreement with the defendant Connett under which Eastern leased space for the storage of its vehicles. Claimant Eastern also agreed to erect an office building. The lease, it is now urged, was for a year. The proof, however, as taken by Judge Bright, clearly indicates that actually claimant Eastern was under a month-to-month tenancy. The specific items of damage said to be suffered by this claimant are: $700 spent in the erection of an office building; $2,210 representing a rent differential which it was compelled to pay at new premises; and an increased cost ($5,627.44) because of the fact that it was compelled to pay 14¢ more per ton for its freight after it removed from East 49th Street. The mere statement of these items should suffice to show: (1) that Eastern had no unexpired term which would entitle it to an award on that score, and (2) that the other items are so far remote that it is pointless to discuss them. The claim of Eastern is accordingly disallowed.

I am not clear whether the disposition of the reserved claims here made should be set forth in a decree supplemental to that of January 11, 1949, or should be entered at the foot of that decree. I never had any doubt about my jurisdiction to pass upon the claims here dealt with, and I hope that counsel will avoid any procedural difficulties that might forbid or impair a review of the whole proceeding considered as a unit. Whatever the form of the decree to be entered may be, I suggest that it should be settled on notice.